1  Martin C. Fliesler  (State Bar No.: 073768)
   Larry T. Harris (State Bar No.: 209044)
2  Michael L. Robbins (State Bar No.: 224087)
   FLIESLER DUBB MEYER & LOVEJOY LLP
3  Four Embarcadero Center
   Fourth Floor
4  San Francisco, California  94111
   Telephone: (415) 362-3800
5  Facsimile: (415) 362-2928

6  Kirk W. Watkins (pro hac vice)
   Michael A. Cicero (pro hac vice)
7  Ana C. Davis (pro hac vice)
   WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
8  One Atlantic Center, Suite 3500
   1201 West Peachtree Street
9  Atlanta, GA 30309
   Telephone:  (404) 872-7000
   Facsimile: (404) 870-4836
10

11 Attorneys for Plaintiff KEY TRAK, INC.

12                   UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14                        SAN JOSE DIVISION

15  KEYTRAK, INC.,

16         Plaintiff,                    Civil Action No..: C-03-00870 PVT

17  v.                                   HEARING DATE AND TIME:
                                          April 15   , 2003 at 10:00 a.m.
18  KEY REGISTER, L.L.C., KEY
    REGISTER SYSTEMS, INC., and KEY      **PLAINTIFF'S MOTION FOR**
19  MANAGEMENT, INC.,                    **TEMPORARY RESTRAINING ORDER,**
                                          **PRELIMINARY INJUNCTION,**
20         Defendants.                   **NOTICE OF MOTION, AND**
                                          **SUPPORTING MEMORANDUM OF**
21                                        **POINTS AND AUTHORITIES**

22

23

24

1

2                                **TABLE OF CONTENTS**

3                                                                    Page

4   I.      INTRODUCTION ...............................……………………….…….. 1

5   II.     STATEMENT OF ISSUES TO BE DECIDED ............................... 1

6   III.    STATEMENT OF RELEVANT FACTS ..................................... 2

7           A.   KeyTrak and the '379 Patent ……………………………………. 2

8           B.   The Key Register System …………………………………. 4

9                1.   Origins and Principal Components ............................ 4

10               2.   Key Register's "KeyCom Device" ............................ 6

11               3.   Sales of the Key Register System ............................ 8

12  IV.    KEYTRAK HAS A STRONG LIKELIHOOD OF SUCCESS IN
        ESTABLISHING DEFENDANTS' INFRINGEMENT OF THE
13      '379 PATENT. ..……............................…………………………………. 8

14          A.   The Preliminary Injunction Standard    …………...……………. 8

15          B.   The Presumption of Validity Applies to this Motion. ................ 9

16          C.   Literal Infringement Exists Here.    ………..…….....……………. 10

17          D.   Claim Construction …………………………………..…….. 10

18               1.   Legal Principles …………………………………….…..... 10

19               2.   Construction of Claim Terms that Might be Contested ....... 12

20          E.   As Construed, Claim 6 of the '379 Patent is Literally Infringed by
                 the Key Register System. ………………………………...………… 17

21

22

23

24                                       i

Page

V.  THE REMAINING FACTORS WEIGH IN FAVOR OF GRANTING
    INJUNCTIVE RELIEF. ............................................................ 18

    A.  Irreparable Harm is Both Presumed and Established Affirmatively.  18

        1.  Threatened Loss of Market Share and Goodwill ............... 19

        2.  Threatened Price Erosion .......................................... 21

        3.  Key Register is Unable to Answer in Money Damages. ........ 21

        4.  Others Will be Encouraged to Infringe Absent an Injunction.  22

    B.  The Balance of Hardships Favors KeyTrak. ............................. 23

    C.  The Public Interest Favors Injunctive Relief. ............................ 24

VI. CONCLUSION ......................................................................... 25


APPENDIX 1: The KeyTrak System ..................................................... I

APPENDIX 2: Preferred Embodiment in the '379 Patent ................................ II

APPENDIX 3: The "KeyCom Device" of the Key Register System ..................... III

APPENDIX 4: Array of Jacks in Key Register System ................................... IV

APPENDIX 5: Claim Chart Showing Infringement of Claim 6 of '379 Patent ..........VI

APPENDIX 6: Table Showing KeyTrak's Estimated Loss of Market Share
            Since Introduction of Key Register System ............................... VIII

- ii -

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3   *3M Unitek Corp. v. Ormco Co.,*
        96 F.Supp.2d 1042 (C.D. Cal. 2000) ……………………………....…..     25

4
    *ACS Hosp. Sys. v. Montefiore Hosp.,*
5       732 F.2d 1572 (Fed. Cir. 1984) ………………………………..…..…     10

6   *A.K. Stamping Co. v. Instrument Specialties Co.,*
        106 F.Supp.2d 627 (D.N.J. 2000) ………………………….…..…..…     21

7
    *Amazon.com, Inc. v. Barnesandnoble.com, Inc.,*
8       239 F.3d 1343 (Fed. Cir. 2001) ………………………………...…....…..     9, 18

9   *Atari Corp. of Am. v. Sega of Am., Inc.,*
        869 F. Supp. 783 (N.D. Cal. 1994) …………………………..…….…..     19, 22

10
    *Bell & Howell Document Mgt. Prods. Co. v. Altek Sys.,*
11      132 F.3d 701 (Fed. Cir. 1997) ……………………...….……….…….…     24

12  *Canon Computer Sys. v. Nu-Kote Int'l,*
        134 F.3d 1085 (Fed. Cir. 1998) ……………………………….…....…..     9, 19

13  *CCS Fitness, Inc. v. Brunswick Corp.,*
14      288 F.3d 1359 (Fed. Cir. 2002) ……………………………..…..……     12

15  *CVI/Beta Ventures, Inc. v. Custom Optical Frames, Inc.,*
        893 F.Supp 508 (D. Md. 1995) ………………………..…...………..     21, 24

16  *H.H. Robertson Co. v. United Steel Deck, Inc.,*
17      820 F.2d 384 (Fed. Cir. 1987) ……………………………….…..…..     9

18  *Hockerson-Halberstadt, Inc. v. Avia Group Int'l,*
        222 F.3d 951 (Fed. Cir. 2000) ……………………….……………..     11, 12

19  *Hybritech, Inc. v. Abbot Labs.,*
20      849 F.2d 1446 (Fed. Cir. 1988) …………………………….………..…..     9, 24

21  *Interactive Gift Express, Inc. v. Compuserve, Inc.,*
        256 F.3d 1323 (Fed. Cir. 2001) ……………………………….……..…..     11

22  *Inverness Med. Switzerland GmbH v. Warner Lambert Co.,*
        309 F.3d 1373 (Fed. Cir. 2002) ………………………..….……..…..     12
23

- iii -

24

Page(s)

*Jacobson v. Cox Paving Co.,*
   19 USPQ2d 1641 (D. Ariz. 1991),
   *aff'd without opinion*, 949 F.2d 404 (Fed. Cir. 1991) ........................ 21, 22

*Karlin Tech., Inc. v. Surgical Dynamics, Inc.,*
   177 F.3d 968 (Fed. Cir. 1999) ............................................... 12

*Markman v. Westview Instruments, Inc.,*
   52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) .................. 9, 10

*Mas-Hamilton Group v. LaGard, Inc.,*
   156 F.3d 1206, 1211 (Fed. Cir. 1998) ........................................ 17-18

*Mikohn Gaming Corp. v. Acres Gaming, Inc.,*
   165 F.3d 891 (Fed. Cir. 1998) ................................................ 9

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,*
   22 F.3d 546 (4th Cir. 1994) ................................................. 19

*Oakley, Inc. v. Sunglass Hut Int'l,*
   316 F.3d 1331 (Fed. Cir. 2003) .............................................. 10

*Polymer Tech., Inc. v. Bridwell,*
   103 F.3d 970 (Fed. Cir. 1996) ............................................... 18, 19

*Purdue Pharma, L.P. v. Boehringer Ingelheim GmbH,*
   237 F.3d 1359 (Fed. Cir. 2001) ............................................. 9, 10, 21

*Reebok Int'l, Ltd. v. J. Baker, Inc.,*
   32 F.3d 1552 (Fed. Cir. 1994) ............................................... 18

*Sinclair Int'l Ltd. v. FMC Corp.,*
   1997 WL 714859 (N.D. Cal. 1997) .......................................... 19

*Smith Int'l v. Hughes Tool Co.,*
   718 F.2d 1573 (Fed. Cir.), *cert. denied*, 464 U.S. 996 (1983) .............. 24

*Solarex Corp. v. Advanced Photovoltaic Sys.,*
   1995 WL 314742 (D. Del. 1995) ............................................. 21

*Spectrum Int'l v. Sterlite Corp.,*
   164 F.3d 1372 (Fed. Cir. 1998) ............................................. 10

- iv -

1    NOTICE IS HEREBY GIVEN THAT, on __April 15__ 2003 at __10: 00__ am.,

2    KeyTrak, Inc. ("KeyTrak"), Plaintiff in the above-styled action, will move the Court for a

3    Temporary Restraining Order and Preliminary Injunction, pursuant to Fed.R.Civ.P. 65.

4        Key Trak requests that the Court issue a preliminary injunction, restraining the

5    defendants from infringing U.S. Patent No. 6,501,379 ("the '379 Patent"), which issued

6    in corrected form on February 11, 2003, and thus enjoining defendants from making,

7    using, selling, or offering for sale a product known as the "Key Register System."

8                        I.    **INTRODUCTION**

9        The facts giving rise to the KeyTrak's request for a preliminary injunction are set

10   forth succinctly in the Verified Complaint, and the Affidavits of Michael A. Cicero,

11   William Maloney, Mark A. Singleton, CB Huchingson, Joseph A. DeRossi, and John

12   Horn, all filed contemporaneously herewith.  Unless Defendants and those acting in

13   concert with them are restrained from making, using, selling, and offering for sale

14   products known as "Key Register Systems," KeyTrak will suffer irreparable harm.

15                   II.    **STATEMENT OF ISSUES TO BE DECIDED**

16       This is a patent infringement case brought by KeyTrak against defendants Key

17   Register, L.L.C. and Key Register Systems, Inc. (collectively, "Key Register"), and

18   defendant Key Management, Inc. ("KMI") for infringement of U.S. Patent No.

19   6,501,379, which issued in corrected form on February 11, 2003 ("the '379 Patent").

20   This cases arises from Defendants' manufacture, use, sale, and offering for sale of a

21   product known as "the Key Register System."  KeyTrak moves this Court to enter a

22   preliminary injunction enjoining Defendants, and all those acting in concert with them

23   who receive notice of the injunction, from making, using, selling the Key Register

24                                          1

Plaintiff's Motion for TRO & Prelim. Inj.
Case No.:  C-03-00870 PVT

1    System, or offering it for sale, or conducting such activities regarding components of the

2    Key Register System that are not staple articles of commerce suitable for non-infringing

3    use. The following are issues to be decided in this Motion:

4       1.    Is there a reasonable likelihood that KeyTrak will succeed in
              establishing that Defendants have infringed Claim 6 of the '379
5             Patent?

6       2.    Is there a threat of irreparable harm to KeyTrak in the event the
              Court denies KeyTrak's request for injunctive relief?

7       3.    Is the threat of irreparable harm to KeyTrak outweighed by any
              harm that may be caused to Defendants if the motion were
8             granted?

9       4.    Is any public interest harmed by granting the relief sought?

10

11      ### III.    STATEMENT OF RELEVANT FACTS

### A.    KeyTrak and the '379 Patent

12      KeyTrak is a privately-held Florida corporation with approximately 100

13   employees, including sales representatives, having a place of business in Duluth,

14   Georgia.[1] KeyTrak designs, manufactures, and installs computerized key control systems

15   for use in a variety of industries, including the automotive sales industry.[2]  The basic

16   components of a key tracking system that has been sold by KeyTrak ("the KeyTrak

17   System") are shown in Appendix 1 to this Memorandum. *See* Maloney Aff. ¶ 4.

18

19   _____

20   [1] *Affidavit of Mark A. Singleton In Support of Plaintiff's Request for Injunctive Relief*
     (hereinafter "Singleton Aff.), at ¶ 3; *Affidavit of William C. Maloney In Support of
21   Plaintiff's Request for Injunctive Relief* (hereinafter "Maloney Aff."), at  ¶ 2.

     [2] Maloney Aff. ¶ 2.
22

23                                    - 2 -
24   _____
     Plaintiff's Motion for TRO & Prelim. Inj.
     Case No.: C-03-00870 PVT
     ATLANTA 332838v4

1    In the late 1980's, KeyTrak innovated the concept of using computer controlled

2    access to safeguard and to track keys.  KeyTrak has installed more than 8,000 of its

3    systems in apartment communities, hospitals, military installations, government facilities,

4    automotive dealerships, high-rise buildings, universities, and office complexes around the

5    world.  Over half of those sales have occurred in the automotive dealership industry.[3]

6    Approximately 61% of KeyTrak's customers in that industry also purchase not only

7    system maintenance services from KeyTrak, but also supplies, such as key tags, tie

8    wraps, license plate holders, rivets, and rings.[4]

9    Since its inception, KeyTrak has spent around 20% of its gross revenue (at least

10    four million dollars annually) on efforts to develop a market for its drawer-based,

11    computerized key control systems.  Additionally, for the past five years, KeyTrak has

12    spent at least one million dollars annually for research and development of its key

13    tracking systems.[5]

14    In furtherance of its business, KeyTrak has obtained fourteen United States utility

15    patents, as well as two design patents, which afford protection over its object tracking

16    systems.[6]  One of these is the '379 Patent, which issued from a patent application related

17

18    _____

[3] Singleton Aff. ¶ 4.

19

[4] *Affidavit of CB Huchingson in Support of Plaintiff's Request for Injunctive Relief*

20    (hereinafter "Huchingson Aff.") at ¶¶ 5 & 6.

21    [5] Singleton Aff. ¶ 5.

22    [6] Verified Complaint ¶ 12;  Maloney Aff. ¶ 6 & Exhibit 2 thereto (Patent Assignment).

23

24    - 3 -

1  to earlier applications filed on September 11, 1998 and on September 9, 1999.[7]  The '379

2  Patent discloses an invention that enhances and expands upon the KeyTrak System.[8]

3  Specifically, it allows storage of larger collections of keys, as well as "larger special

4  function keys, such as keys that incorporate electronic transmitters for locking and

5  unlocking a car remotely." ['379 Patent at Col. 2, ll. 36-40].  The added functionality is

6  further described in Appendix 2, which shows an embodiment that uses a light-emitting

7  diode ("LED") to visibly indicate the location of keys addressed by the computer, and

8  which describes an "addressable switch" that enables such a function.

9  **B.    The Key Register System**

10      **1.    Origins and Principal Components**

11      Mr. Fred Jenkins was the sole owner of a corporation that was a subdistributor of

12  KeyTrak systems until that distributorship was terminated in early 2000.[9]  Mr. Jenkins

13  planned to develop products that would compete directly with KeyTrak, and he

14  subsequently "networked with numerous people" to develop the competing products.[10]

15

16  [7] Verified Complaint ¶¶ 13 & 14.

17  [8] Maloney Aff. ¶ 5 & Exhibit 1 thereto, at Col. 2, ll. 45-47.  All subsequent cites to the
    '379 Patent will be understood to refer to Exhibit 1 to the Maloney Affidavit.
18
    [9] Jenkins Dep. 29:11 – 34:5 & 37:22 – 38:9.  **NOTE:**  Pursuant to Civil L.R. 7-5(a),
19  copies of all cited deposition extracts are authenticated by, and are attached to, the
    *Affidavit of Michael A. Cicero* ("Cicero Aff.") filed simultaneously with this Motion.
20  The cited depositions were taken in an infringement action, pending in the U.S. District
    Court for the Northern District of Georgia, involving another KeyTrak patent (U.S.
21  Patent No. 6,075,441).  Cicero Aff. ¶ 3.

22  [10] Jenkins Dep. 70:23 – 73:19.

23

24                                              - 4 -

Plaintiff's Motion for TRO & Prelim. Inj.
Case No.: C-03-00870 PVT

1   Defendants Key Register Systems, Inc. and Key Register L.L.C. are both

2   California business entities with their principal places in, upon information and belief,

3   Irvine, California.[11]  Mr. Jenkins incorporated Key Register Systems Inc. in May 2000,

4   then incorporated Key Register, L.L.C. in December 2000.  Both entities presently exist,

5   they are both owned solely by Mr. Jenkins, and they share the same office space, phone

6   number, officers, directors, employees, and bank accounts.[12]  Key Register Systems, Inc.

7   and Key Register L.L.C. are hereinafter collectively referred to as "Key Register."

8   Defendant KMI is a Nevada corporation with its principal place of business in

9   Reno, Nevada, its President residing in Crockett, California.  KMI is likewise a former

10  independent sub-distributor of KeyTrak products, having had the territory of northern

11  California.  KMI is presently a distributor for Key Register in that same territory.[13]

12  With assistance from electrical engineers and software programmers, Key

13  Register produced the "Key Register System," a key tracking system that comprises:

    (1)   a computer;
14  (2)   a computer monitor;
    (3)   key tracking software loaded in the computer; and
15  (4)   a key tracking drawer containing: (a) stereo jacks, and (b) key tags each
          comprising a stereo plug, an LED attached to the plug, and a strap holding
16        a key to a casing on the upper portion of the plug.[14]

17  As the seller of that system, Key Register competes with KeyTrak.[15]

18  _____

    [11] Verified Complaint ¶¶ 2 & 3.
19
    [12] Jenkins Dep. 34:20 – 40:19.
20
    [13] Verified Complaint ¶¶ 4, 5, & 26.
21
    [14] Collins Dep. 50:19 – 51:6 & 62:13 – 64:5.
22
    [15] Cicero Aff. ¶ 5 & Exh. I thereto at response to Material Fact No. 12.
23

24                                       - 5 -

Claim 6 of the '379 Patent (*see* Part III.D.2., *infra*) does not require components

(1)-(3). Therefore, infringement can be determined solely by examining component (4).

### 2.    Key Register's "KeyCom Device"

The "keycom device" is a trackable object.[16] The construction of this device is

depicted in Appendix 3. The "keycom device" features a common stereo plug, similar to

those used for headphones.[17] The upper end of the "key com device" carries an assembly

including an "addressable switch" and a light-emitting diode ("LED"), both of which are

encased in a plastic shell, which functions as a casing.[18] The addressable switch turns on

the LED when "addressed":

> Q.    And what -- and what are the different devices that are utilized by the Key
> Register systems that are addressable?
>
> A.    There is a device -- the device that's actually in the key, is one which is
> capable of turning on a light, when addressed.
>     You know, you can -- you can address it, you can get its identification,
> and you can tell it to turn – to turn -- well, to turn something on or off, to open or
> close. And in our case, we can use that to connect to a -- to a light, to turn on the
> light. . . . .[19]

---

[16] Collins Dep. 50:19 – 51:6.

[17] *Id.* at 46:10 – 47:8.

[18] *Id.* at 52:12 – 53:9, 55:17-21, 76:4-9, & 78:11-16.

[19] *Id.* at 48:7-18; *see also id.* at 42:23 – 43:9 & 48:18 – 49:17.

- 6 -

1    The LED is electrically coupled to the addressable switch,[20] and it is positioned to emit

2    light from the top portion of the housing when lit by the addressable switch.[21]

3         Key Register's "addressable switch" comprises an off-the-shelf chip made by

4    Dallas Semiconductor under the designation "DS2405." This type of addressable switch

5    stores a unique identification code ("electronic serial number").[22]

6         As labeled in Appendix 3, the plug of the "keycom device" is comprised of three

7    portions, or "conductors": the tip ("bottom conductor"), the middle portion, and the "top

8    conductor." Each conductor is electrically coupled to the addressable switch, which has

9    three ports: a data port, an I/O port, and a ground port.[23] One conductor is coupled to the

10   data port, another to the ground port, and a third conductor is coupled to the I/O port

11   through the LED.[24] When the plug is inserted into a jack within the drawer, each of the

12   three conductors of the plug engages three corresponding conductors in the jack.[25] In that

13   position, the plug and the jack make three connections: (1) power to the LED; (2)

14   combined signal and power to the addressable switch; and (3) formation of an electrical

15   ground, or "signal return path."[26]

16   _____

17   [20] Collins Dep. 60:23 - 61:5.

     [21] Collins Dep. Exh. 3; *id.* at 87:21 – 88:9 & 55:23-25.

18   [22] Collins Dep. Exh. 6 at p. 2; *id.* at 105:21 – 106:3.

19   [23] Collins Dep. 57:2 – 58:22.

20   [24] *Id.* at 60:14 – 61:5.

21   [25] *Id.* at 62:5-11.

22   [26] *Id.* at 56:23 – 58:11.

23

24                     - 7 -

1          Arrays of jacks[27] are mounted in the Key Register Drawer in "vertical sheet metal

2  columns," shown in Appendix 4. When the keycom device is to be inserted into a jack, it

3  is oriented so that the plug of the keycom device points downwardly, as shown in

4  Appendix 3.[28] In this manner, the keycom device is removably received in the jack.[29]

5        3.     **Sales of the Key Register System**

6          Key Register sold its first Key Register System around January of 2001.[30] Key

7  Register estimates that since that time, it has sold between 600 and 700 Key Register

8  Systems.[31] KMI has been a distributor of Key Register Systems for the territory of

9  northern California.[32] Sales of Key Register Systems continue to the present date.[33]

10    **IV.    KEYTRAK HAS A STRONG LIKELIHOOD OF SUCCESS IN ESTABLISHING DEFENDANTS' INFRINGEMENT OF THE '379 PATENT.**

11  **A.    The Preliminary Injunction Standard**

12          Under Federal Circuit law, KeyTrak is entitled to a preliminary injunction if it can

13  succeed in showing: "(1) a reasonable likelihood of success on the merits; (2) irreparable

---

[27] Collins Dep. 53:21 – 55:6 (storage unit has array of sockets).

[28] *Id.* at 51:14-18.

[29] *Id.* at 53:17-20.

[30] Jenkins Dep. 143:18 – 144:5.

[31] *Id.* at 156:4-9.

[32] Verified Complaint ¶ 26.

[33] *Affidavit of Joseph A. DeRossi in Support of Plaintiff's Request for Injunctive Relief* (Key Register System installed in New Jersey dealership approximately one week after February 6, 2003); *Affidavit of John Horn in Support of Plaintiff's Request for Injunctive Relief* (two Key Register Systems purchased during 2003 NADA show and scheduled to be installed during week of March 3, 2003).

- 8 -

1    harm if an injunction is not granted; (3) a balance of hardships tipping in its favor; and

2    (4) the injunction's favorable impact on the public interest." *Amazon.com, Inc. v.*

3    *Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001).[34]  No one factor,

4    however, is dispositive.  The district court "must weigh and measure each factor against

5    the other factors and against the form and magnitude of the relief requested." *Hybritech,*

6    *Inc. v. Abbot Labs.*, 849 F.2d 1446, 1451 (Fed. Cir. 1988).  Guided by these factors, the

7    decision on whether to grant the relief sought lies within this Court's discretion. *Purdue*

8    *Pharma, L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1363 (Fed. Cir. 2001).

9        "The grant of a preliminary injunction does not require that infringement be

10   proved beyond all question, or that there be no evidence supporting the viewpoint of the

11   accused infringer." *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390

12   (Fed. Cir. 1987), *overruled on other grounds*, *Markman v. Westview Instruments, Inc.*, 52

13   F.3d 967, 977 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).

14   **B.      The Presumption of Validity Applies to this Motion.**

15       To carry its burden as to likelihood of success on the merits, KeyTrak must

16   establish that: (1) it will likely prove infringement, and (2) its infringement claim will

17   likely withstand challenges to the validity and enforceability of the patent. *Purdue*

18   *Pharma*, 237 F.3d at 1363 (citations omitted).  Regarding (2), "a patent is presumed

19   valid, and this presumption exists at every stage of the litigation." *Canon Computer Sys.*

20   *v. Nu-Kote Int'l*, 134 F.3d 1085, 1088 (Fed. Cir. 1998).  "Thus, where the challenger fails

21
_____

22   [34] When the movant seeks to enjoin "the violation of any right secured by a patent," (35
     U.S.C. § 283), issuance of a preliminary injunction is governed by Federal Circuit law.
     *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 894 n.3 (Fed. Cir. 1998).
23

24                                          - 9 -

1  to identify any persuasive evidence of invalidity, the very existence of the patent satisfies

2  the patentee's burden on the validity issue." *Id.*

3  **C.   Literal Infringement Exists Here.**

4  Determination of literal infringement is a two-step process, *i.e.*, construing

5  disputed patent claim terms, then "comparing the properly construed claims to the device

6  accused of infringing." *Purdue Pharma*, 237 F.3d at 1363. Regarding the second step:

7  "Infringement is determined on the basis of the claims, not on the basis of a comparison

8  with the patentee's commercial embodiment of the claimed invention." *ACS Hosp. Sys. v.*

9  *Montefiore Hosp.*, 732 F.2d 1572, 1578 (Fed. Cir. 1984); *Spectrum Int'l v. Sterlite Corp.*,

10  164 F.3d 1372, 1381 (Fed. Cir. 1998) ("To be sure, a court may not predicate an

11  infringement determination on a comparison of an accused product with a patentee's

12  commercial embodiment of his claimed invention.").

13  Liability for direct infringement arises under 35 U.S.C. § 271(a), which prohibits

14  making, using, selling, or offering for sale a product or process embodying a patented

15  invention. Here, there is no dispute that Key Register sold Key Register systems in the

16  United States. *See generally* Part II.B.3., *supra*. Likelihood of success on the merits

17  therefore turns on whether the Key Register System likely contains all limitations of

18  claim 6 of the '379 Patent. *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1344 (Fed.

19  Cir. 2003). That system *actually* contains all limitations, as seen *infra*.

20  **D.   Claim Construction**

21  **1.   Legal Principles**

22  Claim construction is a matter of law for the court. *Markman*, 52 F.3d at 976, 517

23  U.S. at 388. "[O]nly those terms need be construed that are in controversy, and only to

24  - 10 -

1    the extent necessary to resolve the controversy." *Vivid Techs., Inc. v. Am. Science &*

2    *Eng'g, Inc.*, 200 F.3d 795, 804 (Fed. Cir. 1999).

3            The Federal Circuit has set forth a straightforward method by which the district

4    courts should construe disputed claim terms: "It is well-settled that, in interpreting an

5    asserted claim, the court should look first to the intrinsic evidence of record, *i.e.,* the

6    patent itself, including the claims, the specification and, *if in evidence*, the prosecution

7    history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)

8    (italics added).[35]  Regarding consideration of the intrinsic evidence:

9            First, we look to the claim language.  Then we look to the rest of the
        intrinsic evidence, beginning with the specification and concluding with
        the prosecution history, if in evidence.
10

11            If the claim language is clear on its face, then our consideration of the rest
        of the intrinsic evidence is restricted to determining if a deviation from the
        clear language of the claims is specified.  . . . . If however the claim
12        language is not clear on its face, then our consideration of the rest of the
        intrinsic evidence is directed to resolving, if possible, the lack of clarity.

13    *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001)

14    (citations omitted).[36]  Thus, the Court looks first to the disputed claim terms,

15    presumptively construed according to their plain and ordinary meaning. *Hockerson-*

16    _____

17    [35] Neither the application that matured into the '379 Patent, nor any related application,
    has a prosecution history that substantively defines any claim term at issue in this case.
    Therefore, the prosecution history is not in evidence.  KeyTrak is serving defendants'
18    respective counsel in other litigation (though they have not yet entered appearances in
    this case) with copies of the prosecution history of the '379 Patent, the parent application
19    to that patent, and the related provisional application preceding the parent.

20    [36] Extrinsic claim construction evidence need not be relied upon here since, as
    demonstrated *infra*, the meaning of the claim terms discussed herein can be ascertained
21    solely from the intrinsic evidence.  *Hockerson-Halberstadt, Inc. v. Avia Group Int'l*, 222
    F.3d 951, 955 (Fed. Cir. 2000) ("If the meaning of a claim is unambiguous from the
22    intrinsic evidence, then a court may not rely on extrinsic evidence for purposes of claim
    construction.").

23

24                                            - 11 -

1  *Halberstadt*, 222 F.3d at 955 (ordinary meaning assigned to claim terms as a "starting

2  point"); *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)

3  (Federal Circuit applies a "'heavy presumption' that a claim term carries its ordinary and

4  customary meaning."). "It is well settled that dictionary definitions provide evidence of a

5  claim term's 'ordinary meaning.' Potentially relevant dictionaries include dictionaries of

6  the English language (providing general definitions and usages) and technical dictionaries

7  . . . ." *Inverness Med. Switzerland GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1378

8  (Fed. Cir. 2002) (citations omitted).

9      Although the specification is the "single best guide to the meaning of a disputed

10  term," *Vitronics*, 90 F.3d at 1582, limitations from the specification are not to be read

11  into the claims absent evidence of a clear intent to disavow claim scope. *Teleflex, Inc. v.*

12  *Ficosa North Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002). "The general rule, of

13  course, is that the claims of a patent are not limited to the preferred embodiment, unless

14  by their own language." *Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 973

15  (Fed. Cir. 1999). That rule applies here.

16      **2.    Construction of Claim Terms that Might be Contested**

17      Claim 6 of the `379 Patent, which covers the features disclosed therein and also,

18  for reasons discussed *infra*, features of the Key Register System, reads:

19      6. A **trackable object** for use in a key tracking and control system wherein a
    **storage unit** has an *array of sockets* for removably receiving a plurality of said
    trackable objects, said trackable object comprising:

20      a **housing** having a bottom portion and a top portion;
    an **electronic circuit** including an *addressable switch*, said electronic circuit

21      being insertable into said housing;
    *a set of conductors electrically coupled to said electronic circuit* and being

22      positioned on said trackable object such that said *conductors are disposed
    in a socket of said storage unit* when said trackable object is received in

23      the socket;

24                                        - 12 -

1    a *light emitting diode (LED)* in said trackable object, said LED being
2    electrically coupled to said electronic circuit and being positioned to emit
     light from said top portion of said housing when lit by said electronic
     circuit;
3    said addressable switch having a *ground port*, a *data port*, and an *I/O port* and
     said set of electrical conductors including a first conductor electrically
4    coupled to said ground port, a second conductor electrically coupled to
     said data port, and a *third conductor electrically coupled through said*
5    *LED to said I/O port*.[37]

6              a.    "Array of sockets"

7         A "socket" is defined as: "an opening or hollow that forms a holder for

8    something."[38]   The plain meaning of "array" is "a regular and imposing group or

9    arrangement: ORDER." *Webster's* at 98.  The '379 Patent specification does not deviate

10   from the plain meaning of either of these terms.  Thus, the term "array of sockets" means:

11   "a regular arrangement of openings that each form a holder for something."

12             b.    "Housing"

13        The term "housing," which is clear on its face, means: "something that covers or

14   protects: as . . . a case or enclosure (as for a mechanical part or instrument) . . . ."

15   *Webster's* at 887.  The specification does not depart from that plain meaning.  Examples

16   of a "housing" are the carrier of the '379 Patent and the plastic shell of Key Register's

17   keycom device (Appendices 2 & 3).

18

19

20   ───────────────────────────────
     [37] '379 Patent at Cert. of Correction, p. 5 (emphasis added; italicized terms construed).
21
     [38] Cicero Aff. ¶ 4.a. & Exh. F thereto, excerpts from *Merriam-Webster's Collegiate*
22   *Dictionary*, Merriam-Webster, Inc., Springfield, Mass. (Deluxe ed. 1998) (hereinafter
     "*Webster's*"), at 1748.
23

24                                    - 13 -
     ───────────────────────────────

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

    c.    **"Addressable switch"**

"Addressable" means "able to be addressed: directly accessible <*accessible registers in a computer*>". *Webster's* at 20. The term "switch" means: "Electronic circuit for switching between two independent inputs, *e.g.,* by valves, tubes or transistors."[39] The specification of the '379 Patent departs from the definition of "switch" to the extent the disclosed addressable switch may have more than two independent inputs, such as I/O ports "coupled to other switches or elements, such as locks, latches, etc." [Col. 12, ll. 39-41]. Therefore, the proper construction of the claimed "addressable switch" is: "an addressable electronic circuit that can switch between two or more independent inputs."

    d.    **"Set of conductors electrically coupled to said electronic circuit"**

A "conductor" is defined as "a material or object that permits an electric current to flow easily." *Webster's* at 377. The plain meaning of "set" is "a number of things of the same kind that belong or are used together." *Id.* at 1679. Additionally, to "couple" means "to bring (two electric circuits) into such close proximity as to permit mutual influence." *Id.* at 416. The '379 Patent specification does not depart from any of these plain meanings. For illustrative purposes, a preferred embodiment discloses a set of conductors by describing three conductive pads 94 (*see* Appendix 2, *supra*). In the claimed invention, current may flow through the conductors both *to* and *from* the electronic circuit, since that circuit includes the addressable switch having an *I/O* port (defined *infra*). Thus, the term "set of conductors electrically coupled to said electronic

---

[39] Cicero Aff. ¶ 4.b. & Exh. G thereto, excerpts from *Chamber's Science and Technology Dictionary*, W & R Chambers Ltd. and Cambridge Univ. Press (1988) (hereinafter "*Chamber's*") at 876.

- 14 -

1    circuit" means "two or more like objects permitting electric current to flow to or from the

2    electronic circuit."

3           e.      "Conductors are disposed in a socket of said storage unit"

4           "Dispose" simply means "to put in place: set in readiness : ARRANGE." *Webster's*

5    at 526. The '379 Patent specification does not diverge from this meaning. With the

6    terms "conductors" and "sockets" having already been defined, this limitation means that

7    two or more like objects permitting electric current to flow to or from the electronic

8    circuit are arranged within an opening, within the storage unit, that forms a holder for

9    something.

10          f.      "Light emitting diode (LED)"

11          An LED is defined as "a semiconductor diode that emits light when a voltage is

12   applied to it and that is used in an electronic display (as for a digital watch)." *Webster's*

13   at 1045.[40] The '379 Patent specification does not depart from that meaning; to the

14   contrary, the LED shown in FIGS. 5-7, and described in corresponding specification text,

15   conforms precisely to that definition.

16          g.      "Ground port," "Data port," and "I/O port"

17          These features, recited in the final limitation of Claim 6, are elements of the

18   addressable switch, as illustrated in Figure 7 of the '379 Patent, shown on the next page.

19

20

21   _____

[40] A "diode," in turn, is defined as "an electronic device that has two electrodes or

22   terminals and is used especially as a rectifier." *Id.* at 512. A "rectifier" is "a device for
     converting alternating current into direct current." *Id.* at 1535.

23

24                                          - 15 -

1

2

3

4

5

6



SCHEMATIC FOR A STORAGE BOX

*FIG. 7*

7    A "port" is: "Point at which signals from peripheral equipment enter the computer."

8    *Chamber's* at 697. A slight departure from this definition exists to the extent that the

9    '379 Patent uses the term "port" with reference not to an overall computer, but instead to

10   an addressable switch. Furthermore, signals may exit as well as enter the addressable

11   switch through a port, as explained below.

12        "Ground" means: "**a:** an object that makes an electrical connection with the earth

13   **b:** a large conducting body (as the earth) used as a common return for an electric circuit

14   and as an arbitrary zero of potential **c:** electric connection with a ground." *Webster's* at

15   810-11. The specification does not diverge from that plain meaning. In fact, the "RET"

16   abbreviation in FIG. 7 stands for "RETURN," a word used in the dictionary definition,

17   and it denotes the ground port of the addressable switch 140.[41] Thus, "ground port"

18   means "the point at which current to be sent to the earth exits the addressable switch."

19        Regarding the "data port," "data" is "information in numerical form that can be

20   digitally transmitted or processed." *Webster's* at 459. The '379 Patent specification does

21   not diverge from that meaning. Thus, a "data port" is the point at which digitally

[41] Maloney Aff. ¶ 7.

22

23

24                                          - 16 -

1  transmitted information enters the addressable switch. That port is denoted by the

2  "DATA" label in FIG. 7, *supra*.

3       The term "I/O" is an abbreviation for "input/output."[42]  An "input" is "the means

4  by which or the point at which an input (as of energy, material, or data) is made."

5  *Webster's* at 951. An "output" is "the terminal for the output[43] on an electrical device."

6  *Id.* at 1298. Thus, the plain meaning of an "I/O port" is "a terminal through which

7  information can either enter or leave a device." *See also McGraw-Hill* at 1082 (defining

8  "input/output"). The '379 specification does not depart from this meaning other than the

9  fact that the "device" is an addressable switch.

10         h.    **"Third conductor electrically coupled through said LED to said I/Oport"**

11       The terms "conductor," "coupled," and "I/O port" having been defined above, the

12  only portion of this limitation focused upon here is "through said LED." The plain

13  meaning of this term is illustrated in FIG. 7 itself: the LED is placed in the electrical path

14  running between one of the conductors (such as the $V_{in}$ conductor) and the I/O port of the

15  addressable switch.

16  **E.   As Construed, Claim 6 of the '379 Patent is Literally Infringed by the Key Register System.**

17       "To prove literal infringement, the patentee must show that the accused device

18  contains every limitation in the asserted claims." *Mas-Hamilton Group v. LaGard, Inc.*,

---

20  [42] Cicero Aff. ¶ 4.c. & Exh. H, excerpt from *McGraw-Hill Dictionary of Scientific and Technical Terms*,  The McGraw-Hill Companies, Inc. (6th ed. 2003) (hereinafter "*McGraw-Hill*") at 1112.

22  [43] As used in this definition, "output" means "Information leaving a device, data resulting from processing." *Chamber's* at 637.

- 17 -

1    156 F.3d 1206, 1211 (Fed. Cir. 1998). The Key Register System contains each limitation

2    in Claim 6, as made clear from the unequivocal deposition testimony and exhibits

3    discussed in Part II., *supra*. The Claim Chart appearing as Appendix 5 hereto details the

4    precise correspondence between the limitations of Claim 6 and the Key Register System.

5    Additionally, the Proposed Order filed herewith clearly links the evidence of record to

6    each claim limitation. KeyTrak has not only demonstrated that the claim limitations are

7    "likely present" under *Oakley*, it has established actual presence, resulting in a strong

8    likelihood that KeyTrak will succeed in proving literal infringement of Claim 6.

9
## V.  THE REMAINING FACTORS WEIGH IN FAVOR OF GRANTING
10                            INJUNCTIVE RELIEF.

11   **A.     Irreparable Harm is Both Presumed and Established Affirmatively.**

12          "A strong showing of likelihood of success on the merits coupled with continuing

13   infringement raises a presumption of irreparable harm to the patentee." *Reebok Int'l, Ltd.*

14   *v. J. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed. Cir. 1994); *Amazon.com*, 134 F.3d at 1350

15   ("Irreparable harm is presumed when a clear showing of patent validity and infringement

16   has been made.").    Only in narrow circumstances may this presumption be overcome:

17          Absent a finding *clearly* negating irreparable harm, such as that future
       infringement was no longer likely, that the patentee was willing to forgo its right
18     to exclude by licensing the patent, or that the patentee had delayed in bringing
       suit, there was no basis for finding that the presumption of irreparable harm was
19     overcome. *Because of the very nature of a patent, which provides a right to
       exclude, infringement of a valid patent inherently causes irreparable harm in
       the absence of the above, or similar exceptions.*
20
21   *Polymer Tech., Inc. v. Bridwell*, 103 F.3d 970, 975 (Fed. Cir. 1996) (emphasis added;

22   citation omitted). Defendants will be unable to offer sufficient evidence of any of the

23   above examples listed in *Polymer Tech*. The presumption applies with full force here.

24                                        - 18 -

1    Irreparable harm is not only presumed, it is also established affirmatively. The

2  following factors have been recognized as constituting affirmative evidence of irreparable

3  harm to the patentee:

4        1.    **Threatened Loss of Market Share and Goodwill**

5        The Federal Circuit appropriately recognizes that an infringer can inflict damage

6  to the patentee that is irreversible and beyond the ability of damages to remedy:

7        Competitors change the marketplace. *Years after infringement has begun, it
         may be impossible to restore a patentee's (or an exclusive licensee's) exclusive
8        position by an award of damages and a permanent injunction.* Customers may
         have established relationships with infringers. The market is rarely the same
9        when a market of multiple sellers is suddenly converted to one with a single seller
         by legal fiat. Requiring purchasers to pay higher prices after years of paying
10       lower prices to infringers is not a reliable business option.

11  *Polymer Tech.*, 103 F.3d at 975-76 (emphasis added). "Irreparable harm may be shown if

12  failure to issue the injunction would erode the patent owner's market share." *Atari Corp.*

13  *of Am. v. Sega of Am., Inc.*, 869 F. Supp. 783, 790 (N.D. Cal. 1994); *Sinclair Int'l Ltd. v.*

14  *FMC Corp.*, 1997 WL 714859 at *2 (N.D. Cal. 1997) ("Sinclair has made an adequate

15  showing of irreparable injury . . . including threatened loss of Sinclair's market share and

16  good will."); *Canon*, 134 F.3d at 1090 (finding of irreparable harm based upon loss of

17  market share not clearly erroneous).[44]

18       Here, KeyTrak has steadily built considerable goodwill in the automobile

19  dealership industry. KeyTrak innovated the concept of drawer-based computer key

20  _____

[44] *See also Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
21  22 F.3d 546, 552 (4th Cir. 1994) ("[W]hen the failure to grant preliminary relief creates
    the *possibility* of permanent loss of customers to a competitor or the loss of goodwill, the
22  irreparable prong is satisfied.") (emphasis added).

23

24                                    - 19 -
    _____

1    control systems in the late 1980's, and it has invested at least $4 million and $1 million

2    annually over the past five years on market development and on product research and

3    development, respectively.[45]  KeyTrak also established a network of independent dealers

4    for its product, a network that had included the principals of the Defendants as

5    subdistributors, as well as half of all of Key Register's current distributors.[46]

6           As of January 1, 2001, KeyTrak had made roughly 100% of all sales in the

7    drawer-based computerized key control market, because Key Register, the only other

8    seller of drawer-based computerized key control market who was significant enough to

9    have attended the 2003 NADA show, did not emerge until that date.[47]   Since that time,

10   however, Key Register has sold between 600 to 700 systems.  Calculating market share

11   on a year-to-year basis, KeyTrak's market share has declined from virtually 100% to

12   between 56% and 60%.[48]

13          Thus, the Court is not faced with speculative testimony about future harm.  It is

14   here provided with damage that has already occurred (accused infringement of the '441

15   Patent) and that will worsen as infringement of both patents continues.  If left unchecked,

16   further loss of market share is probable.

17   _____

     [45] Singleton Aff. ¶¶ 4 & 5.

18
     [46] *Id.* at ¶¶ 6 & 10.

19
     [47] *Id.* at ¶ 9; Jenkins Dep. 143:18 – 144:5.

20
     [48] *See* Appendix 6 at Table "A."  Even taking a conservative approach, KeyTrak's market

21   share declined from 100% to 92%-93% by the end of Key Register's first year (2001),
     and declined further by the end of Key Register's second year (2002) to 87%-88%.  *Id.* at

22   Table "B."  Under either approach, KeyTrak lost a considerable amount of market share.

23

24                                          - 20 -

2.      **Threatened Price Erosion**

Price erosion constitutes another form of irreparable harm. *Purdue Pharma*, 237 F.3d at 1368 (upholding finding of irreparable harm based on testimony concerning price erosion and "loss of market position"); *A.K. Stamping Co. v. Instrument Specialties Co.*, 106 F.Supp.2d 627, 655 (D.N.J. 2000) ("Indeed, 'economic' considerations such as . . . monies expended on product development, and reduced profits are specifically among the factors that courts consider in finding that a patent holder will face irreparable harm."); *Solarex Corp. v. Advanced Photovoltaic Sys.*, 1995 WL 314742 at *8 (D. Del. 1995) (finding irreparable harm where price erosion cited as one of the bases therefore). KeyTrak has already sustained approximate price erosion damages of over $1.2 million due to price discounts that KeyTrak was forced to make to compete with Key Register.[49] Like loss of market share, price erosion will continue absent prompt Court intervention.

3.      **Key Register is Unable to Answer in Money Damages.**

Key Register's CFO acknowledged that Key Register has not made a profit on its competing system.[50] Therefore, KeyTrak does not have a meaningful chance of recovering damages once it prevails on its patent, further militating in favor of preliminary injunctive relief. *Jacobson v. Cox Paving Co.*, 19 USPQ2d 1641, 1653 (D. Ariz. 1991) (citing irreparable harm factor: "Is the defendant judgment proof?"), *aff'd without opinion*, 949 F.2d 404 (Fed. Cir. 1991); *CVI/Beta Ventures, Inc. v. Custom Optical Frames, Inc.*, 893 F.Supp 508, 524 (D. Md. 1995) ("[T]he inability of an alleged

---

[49] Huchingson Aff. ¶ 4.

[50] Rehn Dep. 5:14-18, 7:8-25, 20:3-14, & 44:2-9; *see also id.* at 51:6-9 (no revenue other than that received from product sales).

- 21 -

1    infringer to respond in money damages has been cited in some cases in support of a

2    finding of irreparable harm . . . .").

3        4.      **Others Will be Encouraged to Infringe Absent an Injunction.**

4            This Court recognized that in *Hybritech*, the Federal Circuit approved of the

5    lower court's assessment of irreparable harm that included the factor: "other infringement

6    would be encouraged in the absence of an injunction." *Atari*, 899 F. Supp. at 790; *see*

7    *also Jacobson*, *supra* ("Will issuance of an injunction deter other existing or potential

8    infringers and influence them to back off?"). Key Register has taken active measures to

9    disseminate its view of the litigation history between itself and KeyTrak and in so doing

10   has encouraged others to keep buying or using the Key Register System. Specifically, on

11   its Internet web site, Key Register has published a letter to the industry from Fred

12   Jenkins, Key Register's President. In that letter, Mr. Jenkins discusses the procedural

13   history of the pending Georgia action (even discussing Key Register's recent response to

14   a partial summary judgment motion) and expresses confidence that Key Register does not

15   infringe KeyTrak's earlier patent.[51] Furthermore, Mr. Jenkins echoed similar statements

16   in facsimilies broadcast directly from Key Register to its customers.[52] Needless to say, if

17   the Court denies this Motion, Mr. Jenkins will use every means at his disposal to

18   publicize the details of this proceeding, as well. Recipients of such material will be

19   encouraged to infringe the '379 Patent. KeyTrak has already had to separately seek

20

21   _____

     [51] Cicero Aff. ¶ 6 & Exh. J thereto at 3rd page.

22
     [52] Huchingson Aff. ¶ 7 & Exh. 1 thereto.

23

24                                    - 22 -
     _____

     Plaintiff's Motion for TRO & Prelim. Inj.
     Case No.:  C-03-00870 PVT

1     redress from defendant KMI in a patent infringement action pending in Nevada.[53]

2     Therefore, through Mr. Jenkins' efforts, others will be encouraged to infringe the '379

3     Patent unless the Court preliminarily enjoins defendants' infringing activities in this case.

4     **B.**    **The Balance of Hardships Favors KeyTrak.**

5        Key Register and/or KMI may attempt to argue that issuance of a TRO or

6     preliminary injunction could put it out of business because it is a small company. The

7     facts indicate otherwise. Specifically, Key Register was able to have the software to

8     operate the Key Register System developed in only around four months plus 100 man-

9     hours.[54] In fact, Mr. Jenkins remarked: "It was easy to do both at the same time" when

10    asked about length of development time.[55] It should take Key Register less time to

11    redesign an up-and-running product than it did to build the product from scratch. These

12    facts show that if enjoined from infringing the '379 Patent, Key Register will not go out

13    of business, but will instead avail itself of its resources to design around the '379 Patent

14    and sell a modified system within a reasonable amount of time.

15        Any arguments about "going out of business" would be unavailing in any event,

16    since the other three injunction factors favor KeyTrak. Small companies who infringe are

17    just as vulnerable to preliminary injunctions as are larger infringers:

18

19

---

[53] Cicero Aff. ¶ 7.

20

[54] Cicero Aff. ¶ 5 & Exh. I thereto at Facts Nos. 23 & 25 (confirming 4-month time, and

21    confirming that Transition Software operates both a "transition system" and the Key
Register System).

22

[55] Jenkins Dep. 143:13-17.

23

24                               - 23 -

1

> [T]he fact that [the accused infringer] is "small" and could be put out of business
> if a preliminary injunction does issue does not insulate it from the issuance of a
> preliminary injunction if the other three preliminary injunction factors are
> sufficient to tip the scale in [the patentee's] favor. . . . Small parties have no
> special right to infringe patents simply because they are small.

2

3

4   *Bell & Howell Document Mgt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 708 (Fed. Cir.

5   1997). Thus, the irreparable harm to KeyTrak that would result from denial of the

6   present motion, as established presumptively and through the evidence discussed in Part

7   IV.A., *supra*, significantly outweighs any harm that would be sustained by Key Register

8   or by KMI upon injunction issuance.

9   **C.     The Public Interest Favors Injunctive Relief.**

10          "[T]he focus of the district court's public interest analysis should be whether there

11  exists some critical public interest that would be injured by the grant of preliminary

12  relief." *Hybritech*, 849 F.2d at 1458. "Absent such proof, it may be assumed that the

13  public interest will not be so affected." *CVI/Beta*, 893 F.Supp.2d at 516. Since the Key

14  Register System does not resemble cutting-edge medical treatment or like product that

15  would represent harm to the public if removed from the market, the public interest factor

16  cannot favor Key Register. *3M Unitek Corp. v. Ormco Co.*, 96 F.Supp.2d 1042, 1052

17  (C.D. Cal. 2000). On the other hand, there is a public interest in protecting rights secured

18  by valid patents. *Smith Int'l v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed. Cir.), *cert.*

19  *denied*, 464 U.S. 996 (1983) ("A court should not be reluctant to use its equity powers

20  once a party has so clearly established his patent rights.").

21

22

23

24                                         - 24 -

## VI.  CONCLUSION

KeyTrak has presented an overwhelming case that it will likely succeed in proving Defendants' literal infringement of Claim 6 of U.S. Patent No. 6,501,379. This entitles KeyTrak to a presumption of irreparable harm, augmented by significant affirmative evidence of irreparable harm. Similarly, the balance of hardships and the public interest also heavily favor KeyTrak. For these reasons, KeyTrak respectfully requests that the Court grant the injunctive relief set forth in the accompanying proposed Order.

Respectfully submitted, this the _6th_ day of March, 2003.

FLIESLER DUBB MEYER & LOVEJOY LLP

/s/ Martin C. Fliesler
Martin C. Fliesler  (State Bar No.:  073768)
Larry T. Harris (State Bar No.:  209044)
Michael Robbins (State Bar No.: 224087)
Four Embarcadero Center
Fourth Floor
San Francisco, California  94111
Telephone:  (415) 362-3800
Facsimile: (415) 362-2928

WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
Kirk Watkins (pro hac vice)
Michael A. Cicero (pro hac vice)
Ana C. Davis (pro hac vice)
One Atlantic Center, Suite 3500
1201 West Peachtree Street
Atlanta, GA 30309
Telephone:  (404) 872-7000
Facsimile: (404) 870-4836

Attorneys for Plaintiff, KEY TRAK, INC.

- 25 -

## APPENDIX 1:  The Key Trak System



*FIG. 1*

The above is a reproduction of Figure 1 of another KeyTrak patent (U.S. Patent No. 6,075,441), showing a control system 50 comprising an inventoriable-object storage unit 52, a remote controller (computer) 54 with monitor 60, and a printer 56.  The above system has utilized plastic strips, or tags, with memory devices attached to the lower portion of the tags.  Keys have been attached to the upper portions of the tags, thereby becoming associated with the unique codes stored in each memory device.  A drawer within the storage unit stores a plurality of such tags.[1]

---

[1] Maloney Aff. at ¶ 4.

I

1

## APPENDIX 2:  PREFERRED EMBODIMENT IN THE '379 PATENT

2       The patent-in-suit, U.S. Patent No. 6,501,379, discloses an enhancement of the

3   KeyTrak System.  This enhancement is made possible through use of a carrier that is

4   large enough to accommodate not only larger keys or larger collections of keys, but also

5   other objects, such as jewelry or narcotics [*Id.* at Col. 3, ll. 35-38].  One of the preferred

6   embodiments of the carrier disclosed in the '379 Patent is shown in Figures 5 and 6 of the

7   '379 Patent, reproduced below.

8

9   

10

11  **FIG. 5**

18

19      FIGS. 5 & 6 of the '379 Patent illustrate a preferred embodiment in which a

20  carrier 81 has a back panel 91, with a circuit board 93, including a light emitting diode

21  ("LED") 98, slidably received in the back panel.  The circuit board 93, mounted to the

22  carrier 81, includes a set of conductive pads 94.  When the carrier 81 is inserted through a

22  receptacle panel 83 in the drawer of the key tracking system and is seated on a backplane

23

24                                  - II -

84 in the drawer as shown above, the conductive pads 94 engage a set of corresponding contacts 97, thereby operatively coupling the electronic components of the circuit board 93 with a computer controller [Col. 10, ll. 55-67]. These components include a microprocessor 118 and a LED 98, which projects through an opening in the top of the carrier 81. Preferably, when the carrier 81 is selected by the system computer controller, the microprocessor 118 lights the LED 98 [Col. 11, ll. 26-29 & 36-45].

As shown in FIG. 7 of the '379 Patent, the circuit carried by the circuit board 93 includes an addressable switch 140, which can be a commercially available chip such as that known under the designation DS2407 [Col. 12, ll. 21-27]. The addressable switch 140 is an integrated circuit electrically coupled, through three ports (one of which is an input-output, or "I/O" port), to the three conductive pads 94, which are ground, data, and $V_{in}$ (power supply) pads, respectively [*Id.* & FIG. 7]. Power from the $V_{in}$ contact pad is routed through the LED, then into the I/O port of the addressable switch 140 [*Id.* at Col. 12, ll. 28-30 & FIG. 7].

- III -

## APPENDIX 3:  THE "KEYCOM DEVICE" OF THE KEY REGISTER SYSTEM[2]



LED

Plug (Top conductor)

Plug (middle portion)

Plug (tip or bottom) conductor

**Lower portion of Collins Dep. Exhibit 3, showing construction of "keycom device" used in Key Register System, with deponent's handwritten notations in blue ink.  (Term "LED" added as restatement of a handwritten notation not shown here).**



**Close-up of "key com" device (Collins Dep. Exh. 4).**

---

[2] Collins Dep. Exhs. 3 & 4; *id.* at 85:14 – 87:9 & 98:18 – 100:7.

- IV -

## APPENDIX 4:  ARRAY OF JACKS IN THE KEY REGISTER SYSTEM[3]



Collins Dep. Exhibit 5, showing two sheet metal columns designed for placement in a drawer of a Key Register System.  Each column carries jacks, shown here with some "keycom devices" inserted therein.

Each column is a single piece of sheet metal, bent into the shape of an inverted channel, and all jacks are carried by the top portion of the column.[4]  Each jack is bolted to the top portion of the sheet metal, through which holes have been punched to accommodate the jacks.[5]

---

[3] Collins Dep. 102:2-23 & Exh. 5 thereto.

[4] Collins Dep. Exh. 3; *id.* at 85:14 – 87:9 & 102:24 – 103:24 (connections go through top portion of column).

[5] Collins Dep. 84:14-25, 90:3 – 91:17, & 104:22 – 105:9.

- V -

Plaintiff's Motion for TRO & Prelim. Inj.
Case No.: C-03-00870 PVT

1

2

**APPENDIX 5:  CLAIM CHART**
**SHOWING INFRINGEMENT OF CLAIM 6 OF '379 PATENT**

3

4

| '379 PATENT, CLAIM 6 | CORRESPONDING STRUCTURE IN "KEY REGISTER SYSTEM"* |
|---|---|
| 6.  A trackable object for use in a key tracking and control system wherein a storage unit has an array of sockets for removably receiving a plurality of said trackable objects, said trackable object comprising: | The Key Register System is a key tracking system, and the keycom devices used in that system are trackable objects [Mem. III.B.1.]. A storage unit (drawer) of this system has an array of sockets [Mem. III.B.2.].  A plurality of trackable objects are removably received in the sockets [*Id.*]. |
| a housing having a bottom portion and a top portion; | The upper portion of the trackable object carries a shell, or housing that has a bottom portion and a top portion [Mem. III.B.2.]. |
| an electronic circuit including an addressable switch, said electronic circuit being insertable into said housing; | Each trackable object has an electronic circuit that includes an addressable switch [Mem. III.B.2.].  The board carrying this circuit is insertable into the housing of the trackable object [*Id.*]. |
| a set of conductors electrically coupled to said electronic circuit and being positioned on said trackable object such that said conductors are disposed in a socket of said storage unit when said trackable object is received in the socket; | Each trackable object has three conductors, each of which is a portion of the plug of the trackable object. Each conductor is electrically coupled to the electronic circuit (addressable switch).  When the plug is inserted into a socket (jack), it is oriented such that the plug points downwardly, such that each portion of the plug (each "conductor") is disposed in the socket [Mem. III.B.2.] |
| a light emitting diode (LED) in said trackable object, said LED being electrically coupled to said electronic circuit and being positioned to emit light from said top portion of said housing when lit by said electronic circuit; | Each trackable object includes an LED [Mem. III.B.2.].  The LED is electrically coupled to the electronic circuit (addressable switch) [*Id.*]. The LED is positioned to emit light from the top portion of the housing when lit by the electronic circuit [*Id.*]. |

19

20

21

**\* NOTE:**  Cites to "Mem.xx" refer to the Memorandum of Points and Authorities preceding this Claim Chart, where "xx" represents the specific Part of the Memorandum supporting the statement preceding the citation. Also, infringement analysis is performed according to the interpretation of claim terms set forth in Part IV.C. of the Memorandum.

22

23

24

- VI -

Plaintiff's Motion for TRO & Prelim. Inj.
Case No.: C-03-00870 PVT

| | |
|---|---|
| said addressable switch having a ground port, a data port, and an I/O port and said set of electrical conductors including a first conductor electrically coupled to said ground port, a second conductor electrically coupled to said data port, and a third conductor electrically coupled through said LED to said I/O port. | The addressable switch of the Key Register system has a ground ("signal return") port, a data port, and an I/O port [Mem. III.B.2.]. One conductor of the trackable object is electrically coupled to the ground port of the addressable switch, a second conductor is electrically coupled to the data port, and the third conductor is electrically coupled to the I/O port of the addressable switch through the LED [Id.]. |

Plaintiff's Motion for TRO & Prelim. Inj.
Case No.: C-03-00870 PVT

## APPENDIX 6:  TABLES SHOWING KEYTRAK'S ESTIMATED LOSS OF MARKET SHARE SINCE INTRODUCTION OF KEY REGISTER SYSTEM

### Table "A":  Year-by-Year Approach

| | MARKET SHARE (%) | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 01/01/2001 | | 01/01/2002 | | 01/01/2003 | |
| | Low | High | Low KR sales[1] | High KR sales[2] | Low KR sales | High KR sales |
| KEYTRAK ("KT") | 100 | 100 | 84.5[3] | 62.8[4] | 59.6[5] | 55.9[6] |
| KEY REGISTER ("KR") | 0 | 0 | 15.5 | 37.2 | 43.4 | 44.1 |

### Table "B":  Cumulative Approach

| | PERCENTAGE OF OVERALL MARKET (%) | | | | | | MARKET SHARE (%) | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 01/01/2001 | | 01/01/2002 | | 01/01/2003 | | 01/01/2001 | | 01/01/2002 | | 01/01/2003 | |
| | Low | High | Low | High | Low | High | Low | High | Low | High | Low | High |
| KT | 14.9[7] | 26.6[8] | 17.5[9] | 30.0[10] | 20.0[11] | 33.3[12] | 100 | 100 | 92.1[13] | 92.9[14] | 87.0[15] | 87.6[16] |
| KR | 0 | 0 | 1.5[17] | 2.3[18] | 3.0[19] | 4.7[20] | 0 | 0 | 7.9[21] | 7.1[22] | 13.0[23] | 12.4[24] |

---

[1] Key Register estimates that it sold between 600 and 700 Key Register Systems, which is over an approximate two-year period beginning January 1, 2001 (Jenkins Dep. 143:18 – 144:5 & 156:4-9).  Totals for the low end reflect an assumption that Key Register sold 250 units in 2001, then 350 units in 2002, for a total of 600 units.

[2] Totals for the high end reflect an assumption that Key Register sold 300 units in 2001, then 400 units in 2002, for a total of 700 units.

[3] KeyTrak states that it sold 1,014 units during the past two years, or 507 units each year (Huchingson Aff. ¶ _).  KeyTrak's market share for 2002 therefore is: 507 divided by 507 + 250, or 84.5%.

[4] $507 / (507 + 300) = 62.8\%$.

- VIII -